scandal when *Caixin*, one of China's most influential financial journals, published a story on Kandi and China's EV subsidy fraud problem. *See supra* note 2.

46. Since the news of the subsidy fraud began to emerge and Chinese regulatory agencies began investigating EV producers such as Kandi, the Company's sales began to plummet.

47. Since the truth about the Chinese EV producer industry began to emerge, the Company reported that the Joint Venture's sales came to a halt in the first quarter of 2016 as Kandi disclosed that zero EVs were sold in that quarter. The Joint Venture also reported a negative $500,000 in revenue in the first quarter of 2016 and Kandi disclosed it had yet to receive any subsidies for the EV sales that occurred in 2015.

48. Chinese regulators acted quickly to reduce available subsidy payments to be phased in over the next four years, with full elimination of the subsidy payments thereafter.

49. According to the article by *SeekingAlpha* (*supra* note 2), a few weeks after news began to emerge that China was going to completely eliminate the subsidy program, Kandi's auditor, Albert Wong & Co., was banned from the auditing industry for failing to investigate purportedly obvious signs of fraud by Kandi's management. Such fraud included allegations that defendant Xiaoming and another Kandi financial controller produced personal bank account statements as evidence of the Company's cash on hand.

50. Then, on July 25, 2016, Geely announced that it was selling its stake in the Joint Venture at a valuation barely above book value because the government policy decisions were no longer favorable to Kandi and the Company was no longer receiving subsidy payments at all.

**Defendants Cause the Company to Issue
False and Misleading Statements and/or Omit Material Information**

51. On May 12, 2014, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"), in which the Company reported

a net loss of $14.08 million, or $0.36 per diluted share, on revenue of $40.17 million, compared to net income of $2.2 million, or $0.07 per diluted share, on revenue of $14.66 million for the same period in the prior year.

52.     The Q1 2014 10-Q was signed by defendants Xiaoming and Xiaoying and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Xiaoming and Xiaoying.  The SOX certifications are as follows:

1.  I have reviewed this report on Form 10-Q of Kandi Technologies Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

53. On August 11, 2014, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2015 (the "Q2 2014 10-Q"), in which the Company reported net income of $11.15 million, or $0.27 per diluted share, on revenue of $32.96 million, compared to a net loss of $1.04 million, or $0.03 per diluted share, on revenue of $12.15 million for the same period in the prior year.

54. The Q2 2014 10-Q stated, in pertinent part:

During the first six months of 2014, we took the initiative to enhance the effective and timely communication between our internal audit department and our Audit Committee. We reorganized our internal audit department so that the head of such department reports directly to the Audit Committee on any reportable issue to enhance the independence and objectivity of the internal audit function. In addition, the internal audit department revisited the policies and procedures of internal audit and made modification to keep internal audit workflow in compliance with SEC requirements. On May 30, 2014, the Audit Committee of the Board of Directors held a special meeting and approved the new Internal Audit Activity Charter.

55. The Q2 2014 10-Q was signed by defendants Xiaoming and Xiaoying and contained certifications pursuant to SOX, signed by defendants Xiaoming and Xiaoying, which were the same or substantially similar to the SOX certifications described above.

15

56. On November 10, 2014, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2014, (the "Q3 2014 10-Q"), in which the Company reported net income of $13.53 million, or $0.31 per diluted share, on revenue of $44.20 million, compared to a net loss of $7.68 million, or $0.21 per diluted share, on revenue of $17.14 million for the same period in the prior year.

57. The Q3 2014 10-Q stated, in pertinent part:

We have evaluated, under the supervision of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), the effectiveness of disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of September 30, 2014. ***Based on this evaluation, our CEO and CFO concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective***.

\*   \*   \*

During the quarter ended September 30, 2014, we continued to implement the remediation measures according to our new Internal Audit Activity Charter that were approved on May 30, 2014. In addition, the Audit Committee conducted a self-assessment to assess our effectiveness in oversight of management and updated the Audit Committee Charter.

Other than those set forth above, there was no change to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this report that have materially affected, or are reasonably

58. The Q3 2014 10-Q was signed by defendants Xiaoming and Xiaoying and contained certifications pursuant to SOX, signed by defendants Xiaoming and Xiaoying, which were the same or substantially similar to the SOX certifications described above.

59. On March 16, 2015, the Company filed its annual report on Form 10-K with the SEC for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K"), in which the Company reported net income of $1.67 million, or $0.04 per diluted share, on revenue of $52.89 million, compared to a net loss of $14.64 million, or $0.37 per diluted share, on revenue of $50.57

16

million for the same period in the prior year.  In the 2014 10-K, the Company further reported, for fiscal year 2014, net income of $12.27 million, or $0.29 per diluted share, on revenue of $170.23 million, compared to a net loss $21.14 million, or 0.61 per diluted share, on revenue of $94.54 million for 2013.

60. In connection with the Company's description of its controls and compliance policies, the 2014 10-K stated, in pertinent part:

> **Item 9A. Controls and Procedures.**
>
> **(a) Evaluation of Disclosure Controls and Procedures**
>
> The Company has evaluated, under the supervision of the Company's Chief Executive Officer and the Chief Financial Officer, the effectiveness of disclosure controls and procedures as of December 31, 2014. This is done in order to ensure that information the Company is required to disclose in reports that are filed or submitted under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is: (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.
>
> ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2014.***
>
> **(b) Management's Annual Report on Internal Control Over Financial Reporting**
>
> \*   \*   \*
>
> Management conducted an assessment of the effectiveness of our system of internal control over financial reporting as of December 31, 2014, the last day of our fiscal year. This assessment was based on criteria established in the framework Internal Control—Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and included an evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment. ***Based on management's evaluation under the 2013 COSO framework, management concluded that the Company's internal controls over financial reporting were effective as of December 31, 2014.***

61.     The 2014 10-K was signed by defendants Xiaoming, Xiaoying, Liming, Lewin and Yu, as well as Ni Guangzheng and Qian Jingsong ("Jingsong"), a director of the Company from January 2011 until December 16, 2016 when Jingsong did not stand for re-election at the annual meeting of shareholders.

62.     The 2014 10-K contained certifications pursuant to SOX, signed by defendants Xiaoming and Xiaoying, which were the same or substantially similar to the SOX certifications described above.

63.     On April 10, 2015, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2015 annual meeting of shareholders (the "2015 Proxy"). In the 2015 Proxy, Defendants solicited shareholder votes in connection with the following matters (among others):

- To amend the 2008 Omnibus Long-term Incentive Plan to increase 9,000,000 shares that are available for issuance thereunder;

- To conduct an advisory vote on the compensation of our named executive officers as disclosed in this proxy statement pursuant to the compensation disclosure rules of the Securities and Exchange Commission…

64.     In describing compensation for the Company's named executive officers, the 2015 Proxy states that based on "performance targets set up pursuant to the [2008 Omnibus Long-term Incentive] Plan…the Compensation Committee and the Board approved the grant of common stock for 100,000 shares of common stock to Mr. Hu [Xiaoming] and 60,000 to Ms. Zhu [Xiaoying] in 2014."[8]  In connection with the stock awards received by the Company's directors and/or named executive officers for 2014, the 2015 Proxy failed to disclose material information

---

[8] In particular, pursuant to Section 9.2 of the Company's 2008 Omnibus Long-Term Incentive Plan, the Compensation Committee "shall determine at the Grant Date or thereafter, the time or times at which and the circumstances under which a [Stock Appreciation Right] [] may be exercised in whole or in part (including **based on achievement of performance goals** and/or future service requirements)…."